USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 21, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MELANIE ZAMORA,

                                Plaintiff,

       -v-                                  15-cv-6532 (KBF)

MORPHIX COMPANY, LTD.,                OPINION & ORDER

     Defendant, Counterclaim Plaintiff,
          and Third-Party Plaintiff,

       -v-

MELANIE ZAMORA,

                       Counterclaim Defendant,

MGZ CONSULTING, LLC,

                       Third-Party Defendant.
------------------------------------------------------------X
KATHERINE B. FORREST, District Judge:

From February 6, 2012 to December 31, 2014, Melanie Zamora ("Zamora") performed consulting work for BP Exploration Operating Company ("BP") pursuant to a series of work orders issued by Morphix Company, Ltd. ("Morphix" or "plaintiff"[1]). This action, as it currently stands, concerns whether Zamora (and by extension, MGZ Consulting, LLC ("MGZ") (collectively, "defendants")), committed a breach of contract when she applied for and accepted a job with BP in September 2014.

---

[1] As reflected in the case caption, Zamora was the original plaintiff in this action. However, as described infra, the only remaining claims are counter and third-party claims brought by Morphix. Accordingly, Morphix is referred to as "plaintiff" and both Zamora and MGZ are referred to as "defendants" throughout this Opinion & Order for purposes of convenience.

The Court held a two-day jury trial in this action from October 10-11, 2017. At the close of evidence, defendants renewed their motion for judgment as a matter of law (originally made at the close of plaintiff's case) pursuant to Fed. R. Civ. P. 50(a) ("Rule 50(a)"). (See Trial Tr. at 353-354, ECF Nos. 147-148.[2]) Defendants argued, in sum, that Morphix failed to establish any damages resulting from Zamora's decision to accept BP's job offer, and therefore they were entitled to judgment as a matter of law. The Court reserved judgment on that motion and elected to "see what the jury does" before ruling. (Trial Tr. at 355.)

Later that day, the jury returned a verdict in favor of Morphix, finding: (1) that Zamora and MGZ committed a breach of contract; and (2) Morphix was entitled to recover $33,000 in damages as a result of that breach. (ECF No. 144.) After the jury was discharged, the Court directed the parties to meet and confer regarding resolution of the outstanding attorneys' fees issue (because of a fee shifting provision in the contract at issue, liability for attorneys' fees is significantly larger than any actual verdict) and whether any post-trial motions would be filed. (Trial Tr. at 359-64.) Currently pending before the Court is defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) ("Rule 50(b)"). (ECF No. 153.) Plaintiff opposed that motion on November 15, 2017 (ECF No. 157), and defendants replied on November 20, 2017 (ECF No. 158.)

---

[2] The transcript of proceedings held on October 10, 2017 was filed at ECF No. 147, and comprises pages 1-201 of the combined trial transcript. The transcript of proceedings held on October 11, 2017 was filed at ECF No. 148, and comprises pages 202-365 of the combined trial transcript. For purposes of convenience, the Court will refer to the two separate filings collectively as "Trial Tr." with the appropriate page number.

For the reasons stated below, the Court concludes that no reasonable juror could have found that Morphix suffered any damage resulting from defendants' conduct, and therefore, there was no breach of contract as a matter of law. Accordingly, defendants' motion at ECF No. 153 is hereby GRANTED in full, and the jury's verdict in favor of Morphix is VACATED.

I.   FACTUAL BACKGROUND[3]

   A.   The Governing Agreements

Morphix is a consulting and technical services firm that relies at least in part on subcontractors to perform work for clients. In February 2011, Morphix began consulting on the BP Well Advisor Project ("BPWA Project"), the ultimate goal of which was to improve the performance and safety of BP's drilling operations.

In January 2012, Morphix hired MGZ to perform certain work on the BPWA Project. At all times relevant to this action, Zamora was MGZ's president and managing member. During the course of their collaboration on the BPWA Project, Morphix and MGZ entered into two distinct types of agreements, both which are described below.

      1.   The Consulting Agreement

On January 17, 2012, Morphix and MGZ executed a Consulting Agreement ("CA"). (DX5 ("CA").) The CA provides, inter alia, that Morphix can "make use of knowledge, resources or skills of [MGZ] for the marketing of its products and

---

[3] This recitation of facts is derived from evidence presented at trial, including both live and deposition testimony and documentary evidence. (See generally Trial Tr.) The facts are undisputed unless otherwise noted.

3

services, or for undertaking of work," (CA at 1), and that MGZ will "act[] as an independent contractor of Morphix" in performing services under the agreement (CA § 7.1). Zamora executed the CA on behalf of MGZ, and Mark Newman ("Newman")—Morphix's managing director—signed on behalf of Morphix. (CA at 8.)

As Newman described during trial, the CA was effectively a "framework agreement" designed to "set[] up the general terms and conditions between the two companies." (Trial Tr. at 75.) Rather than outlining specific work to be performed by MGZ, the CA contemplates that Morphix will place independent "Work Orders," which must be "documented in writing an incorporated by reference into [the CA]." (CA §§ 1.1.4, 1.1.5, 5.1; see also Trial Tr. at 75 (Newman testified that a separate work order is necessary to "actually trigger the piece of work being done").) The CA makes clear that Morphix was "not obligated to place any Work Orders" (CA § 2.4), and neither MGZ nor Zamora were obligated to accept a Work Order that had been placed (see Trial Tr. at 125 ("Q. And Ms. Zamora was under no obligation to accept a subsequent work order once she finished the first one? A. That is correct, yes.")).

As relevant here, Sections 2.3, 4.2, and 16.1 of the CA relate to the protection of Morphix's business interests. The Court sets forth those provisions in full:

- Section 2.3: "Consultant warrants that it will not accept work from any third party; i) using Intellectual Property owned by Morphix or; ii) relating to products or services owned by Morphix." (CA § 2.3.)

- Section 4.2: "In the performance of its duties hereunder, Consultant shall act so as to safeguard the Intellectual Property, commercial and contractual interests of Morphix and shall comply with all reasonable requests and directions of Morphix or its nominee." (CA § 4.2.)

4

- <u>Section 16.1</u>: "Consultant undertakes that it shall not, without the prior written consent of Morphix, either during or within twelve months after completion of this Agreement or termination of this Agreement, which ever is the later, either directly or indirectly offer its services to, or accept work from, companies, individuals or organizations which were partners, associates, competitors or active prospects of Morphix during the period of twelve months immediately prior to the completion or termination of this Agreement. An active prospect is a company, individual or organization with whom Morphix was negotiating at the time of completion or termination of this Agreement or had held negotiations at any time during a period of twelve months prior to the completion or termination of this Agreement and where any such negotiations were known to Consultant." (CA § 16.1.)

2. The BP Work Orders

Morphix and MGZ entered into twelve separate Work Orders relating to the BPWA Project between February 6, 2012 and December 31, 2014. (<u>See generally</u> DX6 ("Work Orders").) The individual Work Orders are virtually identical, except for the dates identifying the period they governed and the description of the work to be performed. Each Work Order lists Zamora as the "Named Individual"—or the person tasked with supplying services to Morphix—and each is explicitly incorporated into the CA and thus governed by its terms and conditions. (<u>See, e.g.</u>, Work Orders at 1; <u>see also</u> CA § 1.1.4 ("Each and every Work Order placed shall be expressly governed by this Agreement and shall be deemed incorporated herein.").) Zamora signed each Work Order. It is undisputed that the last Work Order expired on December 31, 2014, and that Morphix did not place and the parties did not execute any Work Orders subsequent to that date.

B. <u>Zamora Applies for a Job with BP</u>

In early September 2014, Zamora applied for a job with BP. BP subsequently offered Zamora a job on November 12, 2014, and Zamora accepted that same day.[4] Morphix objected to Zamora accepting employment with BP based on certain purported restrictions in the Consulting Agreement.

On November 25, 2014, Newman sent an e-mail informing BP that its job offer to Zamora was "in direct conflict with the proposal we have made to settle historic issues," including a proposed agreement not to "solicit or employ the other's staff going forward." (Trial Tr. at 93-94; PX24.) Newman further informed BP that its job offer exposed Zamora to "legal action with regard to breaches of her own service contract with Morphix." (<u>Id.</u>) BP ultimately revoked Zamora's employment offer on January 13, 2015. (<u>See</u> DX19 (notifying Zamora that BP was "rescinding our employment offer . . . due to the existence of a non-compete with your former employer").) It is undisputed that Zamora never actually worked for BP directly.

C. <u>Litigation History</u>

On February 18, 2015, Zamora sued Morphix for declaratory judgment and tortious interference with contractual relations in the U.S. District Court for the Southern District of Texas. (<u>See</u> Compl., ECF No. 1.) The case was transferred to this District on August 19, 2015. (ECF No. 21.) Morphix answered on October 2, 2015, bringing counterclaims against Zamora and third-party claims against MGZ.

---

[4] Importantly, it is undisputed that the job Zamora applied for and accepted was unrelated to the consulting work she had previously done for BP. In other words, she was not seeking to simply continue her current line of work without Morphix's involvement; she applied for a completely new position.

6

(See Answer, Countercl., and Third-Party Compl. ("Morphix Compl."), ECF No. 24.) Morphix alleged, inter alia, that Zamora and MGZ: (1) breached various sections of the CA when Zamora sought and obtained an employment offer from BP (Id. ¶¶ 105-110); (2) wrongfully interfered with Morphix's contract with BP (the "BP Contract") (Id. ¶¶ 111-116); and (3) wrongfully interfered with Morphix's prospective business relationship with BP (Id. ¶¶ 117-121). Morphix sought damages, attorneys' fees, and costs.

Following a period of discovery and a brief stay to allow for good-faith settlement negotiations (which were ultimately unsuccessful), both sides moved for summary judgment in July 2016:

- On July 7, 2016, Morphix moved for summary judgment against Zamora and for partial summary judgment on its own breach of contract claim. (See Mem. of Law in Supp. of Morphix's Mot. for Summ. J. ("Morphix Mem."), ECF No. 86.) In response, Zamora withdrew her claim for declaratory judgment and opposed summary judgment on her tortious interference claim. (See Mem. of Law in Supp. of Zamora/MGZ Response to Morphix's Mot. for Summ. J. ("Zamora/MGZ Opp'n"), ECF No. 89.)

- On July 12, 2016, Zamora and MGZ moved for summary judgment on their own tortious interference claim, and for partial summary judgment against Morphix's breach of contract claim. (See Mem. of Law in Supp. of Zamora/MGZ Mot. for Summ. J. ("Zamora/MGZ Mem."), ECF No. 84.)

7

Morphix opposed that motion on July 28, 2016.  (See Mem. of Law in Opp'n to Zamora/MGZ Mot. for Summ. J. ("Morphix Opp'n"), ECF No. 91.) In addition, both parties moved for attorneys' fees and costs at various points in their briefs.  After the above-referenced motions were fully briefed, this action was transferred from Judge Analisa Torres to the undersigned for all purposes on November 22, 2016.

On January 10, 2017, this Court issued an Opinion & Order resolving the dueling motions for summary judgment.  (See Op. & Order, ECF No. 102.)  With regards to Zamora's tortious interference claim, the Court held that because Zamora never had a final contract in place with BP, Morphix was entitled to summary judgment.  (Id. at 18-19.)  As for Morphix's breach of contract claim, the Court held that Zamora and MGZ were entitled to summary judgment with regards to Sections 8.2, 9.1, 9.2, and 14.2 (regarding breach of Morphix's confidential information and intellectual property), but that there were triable issues of material fact as to whether Zamora and MGZ breached Sections 2.3, 4.2, or 16.1 (concerning protection of Morphix's commercial and contractual interests).  (Id. at 14-18.)  Finally, the Court determined that it was premature to declare either party the "prevailing party" for purposes of awarding attorneys' fees and costs under the CA, and therefore denied both parties' motions for summary judgment on that basis.  (Id. at 19.)

D.  Trial Proceedings

As a consequence of the Court's January 10, 2017 Opinion & Order, only three sets of claims remained: (1) Morphix's claim for breach of Sections 2.3, 4.2, and 16.1 of the CA (Morphix Compl. ¶¶ 105-110); (2) Morphix's four tortious interference claims (Id. ¶¶ 111-129); and (3) the parties' respective claims for attorneys' fees and costs under § 20.4 of the CA. On May 1, 2017, the parties informed the Court that Morphix was voluntarily withdrawing three of its tortious interference claims.[5] (ECF No. 119.)

A two-day jury trial commenced on October 10, 2017. Before the jury was empaneled, defendants made the strategic decision to concede that Zamora was personally bound by the CA and individual Work Orders for purposes of this action. (Trial Tr. at 41-42.) As a result, the Court dismissed Morphix's remaining tortious interference claim (for interference with Morphix's prospective business relations with BP) as duplicative. (Trial Tr. at 16-20, 42; see also ECF No. 139.) The parties further agreed that the attorneys' fees issue should not be tried to the jury, but instead dealt with separately after the conclusion of trial. (Trial Tr. at 11-12.) As such, the only issue actually presented at trial was whether Zamora and MGZ breached Sections 2.3, 4.2, and 16.1 of the CA, and if so, what damages Morphix was entitled to recover.

---

[5] Specifically, Morphix voluntarily withdrew: (1) its claim against MGZ for tortious interference with the BP Contract (Morphix Compl. ¶¶ 111-116); (2) its claim against Zamora for tortious interference with the CA (Id. ¶¶ 122-125); (3) its claim against Zamora for tortious interference with Morphix's prospective business relations with MGZ (Id. ¶¶ 126-129).

On October 11, 2017, the jury returned a verdict in favor of Morphix. (Trial Tr. at 357-58; see also ECF No. 144.) Specifically, the jury concluded that both Zamora and MGZ breached the CA, and that Morphix was entitled to recover $33,000 in damages. (ECF No. 144.)

E. Motions for Judgment as a Matter of Law

At the close of Morphix's case, defendants moved for judgment as a matter of law pursuant to Rule 50(a). (Trial Tr. at 211-13.) The Court noted that it was a "non-frivolous motion," and that there was a "serious question as to whether any reasonable juror could conclude that there is damage" resulting from Zamora's decision to seek employment with BP. (Id.) That said, in the interest of allowing all the evidence to come in, the Court elected to reserve judgment on defendants' motion. (Trial Tr. at 212.)

After the jury was charged, but before the verdict was delivered, defendants renewed their motion for judgment as a matter of law pursuant to Rule 50(a). (Trial Tr. at 353-54.) Defendants argued, in sum, that there was "no evidence that damages were sustained by any conduct of the defendant," and that "the evidence supports that . . . Ms. Zamora and MGZ were free to leave [Morphix] without any obligation." (Trial Tr. at 353.) In response, Morphix argued that the evidence showed Zamora failed to "provide reasonable notice and reasonable cooperation to enable Morphix to make a transition to a new Morphix consultant," and that the jury "could infer that if she had not [breached the contract], she would have continued during the work" and "Morphix would have continued to have the

10

revenue." (Trial Tr. at 354-55.) After hearing brief oral argument on defendants' motion, the Court once again elected to reserve judgment and "see what the jury does" before ruling. (Trial Tr. at 355.)

As noted above, the jury ultimately returned a verdict in favor of Morphix, concluding that Zamora and MGZ breached the CA and that Morphix was entitled to recover $33,000 in damages. (ECF No. 144.) After the verdict was delivered and the jury was discharged, the Court directed the parties to meet and confer regarding resolution of the outstanding attorneys' fees issue (which was not presented to the jury), and whether any post-trial motions would be filed. (Trial Tr. at 359-64.) As previously noted, due to a fee shifting provision in § 20.4 of the CA, attorneys' fees are likely to be substantially larger than the jury's breach award. During that discussion, the Court indicated that "the amount of the damage [decided by the jury] doesn't strike me as . . . outrageous," and that "I am not immediately inclined to grant a JNOV." (Trial Tr. at 362.) That said, the Court made clear that was just an "initial reaction," and that "I am not prepared right now to say that under no circumstances would I grant such a motion." (Trial Tr. at 363-64.)

On October 30, 2017, defendants timely filed a motion for judgment as a matter of law pursuant to Rule 50(b). (ECF No. 152.) Plaintiff opposed that motion on November 15, 2017 (ECF No. 157), and defendants replied on November 20, 2017 (ECF No. 158).

II. LEGAL PRINCIPLES

A. Judgment as a Matter of Law

Rule 50(b) permits a party who has previously made a motion for judgment as a matter of law under Rule 50(a) to renew that motion following a jury verdict. See Fed. R. Civ. P. 50(b). In reviewing such a motion, the Court must review the record as a whole and consider the evidence in the light most favorable to the non-moving party—here, Morphix. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150-51 (2000); see also Zellner v. Summerlin, 494 F.3d 344, 370-71 (2d Cir. 2007). As the non-movant, Morphix is entitled as a matter of law to all <u>reasonable</u> inferences a jury might have drawn in its favor. See Zellner, 494 F.3d at 371. The Court may not make credibility determinations or weigh the evidence. Reeves, 530 U.S. at 150 (citations omitted).

The law is clear that once a jury has returned a verdict, a movant's burden on a Rule 50 motion is a heavy one, and "particularly heavy" where the jury has deliberated and returned a verdict in favor of the non-movant. See Cash v. Cty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011). The Court must leave that verdict in place unless "the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998) (citations omitted); see also Concerned Area Residents for Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994) (requiring complete absence of evidence supporting verdict for Rule 50(b) motion).

The Second Circuit has held that a Rule 50 motion may generally be granted only if "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against him." See Hernandez v. Keane, 341 F.3d 137, 143-44 (2d Cir. 2003). Further, "a Rule 50 motion may only be sustained based on insufficiency of evidence—not on an alleged inconsistency in the jury's verdict." In re The Reserve Fund Sec. & Derivative Litig., 2013 WL 5432334, at *7 (S.D.N.Y. Sept. 30, 2013); see also Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 87 (2d Cir. 2006); Tolbert v. Queens College, 242 F.3d 58, 74 (2d Cir. 2001); In re Vivendi Universal S.A. Sec. Litig., 765 F.Supp.2d 512, 550 (S.D.N.Y. 2011).

B.  Breach of Contract

The CA is governed by New York law. (CA § 20.4.) To sustain a claim for breach of contract, New York law requires that plaintiff prove, by a preponderance of the evidence: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted); see also National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004).

"Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach <u>directly and proximately caused</u> his or her damages." National Market Share, Inc., 392 F.3d at 525 (citations omitted) (emphasis in original). Further, it is well established that "[m]ere conjecture, surmise or speculation is not enough to sustain a claim for damages." Fiederlein v. N.Y. City Health & Hosp. Corp., 56 N.Y.2d 573, 574 (1982); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 124 (1969) (holding "the factfinder is not entitled to base a judgment on speculation or guesswork"); Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1010 (2d Cir. 1991) ("New York law does not countenance damage awards based on [s]peculation or conjecture." (internal quotation omitted)). This rule, "which proscribes the recovery of uncertain and speculative damages[,] applies where the fact of damages is uncertain, not where the amount is uncertain." Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co., 371 F.3d 105, 109 (2d Cir. 2004).

III. DISCUSSION

The Court does not take its decision to grant a Rule 50 motion lightly, particularly when the jury has returned a verdict in favor of the non-moving party. However, having presided over trial and carefully reviewed all of the relevant exhibits and transcripts, the Court concludes that there was insufficient evidence to sustain a finding of damages resulting from defendants' conduct. Accordingly, there

14

was no breach of contract, and defendants are entitled to judgment as a matter of law.

As a threshold matter, it was not unreasonable for the jury to conclude that defendants violated the CA. Section 16.1 concerns the protection of Morphix's business interests, and contains broad language requiring MGZ and Zamora to refrain from seeking or accepting work from third-parties "which were partners, associates, competitors or active prospects of Morphix during the period of twelve months immediately prior to the completion or termination of [the CA]." (CA § 16.1.) It is undisputed that Zamora applied for a job with BP during the course of her twelfth and final Work Order with Morphix, and that Morphix had a commercial relationship with BP during that time. Putting aside whether Zamora used any of Morphix's intellectual property or failed to "safeguard the . . . commercial and contractual interests of Morphix" in doing so (CA §§ 2.3, 4.2), a jury could reasonably conclude that she violated § 16.1 by applying to BP. Thus, the finding of violation is not at issue here.

But the mere violation of a contractual provision, standing alone, does not constitute a "breach" under New York law. Plaintiff also must demonstrate that it suffered <u>damages</u> as a result of the violation. <u>See, e.g.</u>, <u>Diesel Props S.r.l.</u>, 631 F.3d at 52. Here, there is insufficient evidence that Morphix suffered damage of any kind as a result of Zamora's decision to seek employment with BP, regardless of whether such conduct violated the CA.

It is undisputed that Morphix was not contractually obligated to place any Work Orders pursuant to the CA, and that neither MGZ nor Zamora were contractually obligated to accept any Work Orders that Morphix chose to place. (CA § 2.4; Trial Tr. at 125 ("Q. And Ms. Zamora was under no obligation to accept a subsequent work order once she finished the first one? A. That is correct, yes.").) It is further undisputed that although Morphix and defendants executed twelve separate Work Orders related to the BPWA Project from 2012-2014, the final Work Order expired on December 31, 2014, and the parties did not execute a thirteenth Work Order subsequent to that date. (Trial Tr. at 129 ("Q. You've never proposed a work order 13? A. No, no.").)

Similarly, it is undisputed that BP had to authorize each and every Work Order, and that BP had unilateral authority to cancel its contract with Morphix at any time, with or without cause. (Trial Tr. at 134 ("Q. And then BP would have to approve the work before it could be started? A. Yes. Q. Because, otherwise, nobody gets paid? A. Yes."); PX5 ("BP Contract") § 5.01.) And Justin Kelso, a BP employee who oversaw Zamora's work on the BPWA Project, testified that: (1) "[a] lot of what [Zamora] was working on was already completed, and . . . was basically in a maintenance stage" at the time she stopped working for Morphix (Trial Tr. at 303); (2) the work that Zamora had been doing on the BPWA Project was taken in-house, and that he personally "took over a lot" of it (Id.); (3) there was a "planned reduction in contracting staff" at that time within BP (Trial Tr. at 304); and (4) the decision to take Zamora's work in-house (rather than, for instance, continuing with another

16

Morphix contractor) "[r]eally . . . didn't have much to do with Melanie rolling off of the project, but that had everything to do with the fact that BP was planning on rolling off contractors in general, including the Morphix consultants, by the end of [2016]" (Id.).

Morphix's argument that, had Zamora not sought employment with BP at the end of 2014, she would have continued working for Morphix on the BPWA Project (or in the alternative, that Morphix could have assigned a different contractor to cover her work), is based on nothing more than "[m]ere conjecture, surmise or speculation." Fiederlein, 56 N.Y.2d at 574; see also Zenith Radio Corp., 395 U.S. at 124; Wolff & Munier, Inc., 946 F.2d at 1010. There is simply no evidence tending to suggest that Morphix would have continued receiving revenue from BP related to Zamora's work assignment beyond December 31, 2014.

First, although Zamora had executed a series of Work Orders with Morphix, nothing obligated her to continue accepting work on the BPWA Project. At trial, Morphix did not contradict Zamora's testimony that she had been looking for a permanent job for some time due to "decline in the work that was happening at BP" as well as the falling price of oil, which could result in "contractors and consultants" being fired from companies like BP. (Trial Tr. at 237-38.) Zamora further testified that she had "been looking for quite a while," that she wanted "a permanent role," and that she "looked for several offers." (Trial Tr. at 239.) And indeed, it is undisputed that Zamora received a separate job offer from Chevron, and that Morphix actively encouraged her to take that job in December 2014. (Trial Tr. at

17

136 ("Q. Okay. And isn't it true, sir, that you, through your counsel, advised and encouraged Ms. Zamora to take a job at Chevron? A. Chevron? Q. The gas company? A. Yes. Q. Isn't it true that's what Morphix encouraged Ms. Zamora to do back in December of 2014? A. Yes, and that's what I encouraged her to do, well, yes, in our conversation.")

Put simply, Morphix did not produce <u>any</u> evidence tending to show that Zamora would have continued working on the BPWA Project into 2015, and therefore its argument that "if Zamora had not violated the contract and sought out employment with BP . . . she would have continued to work as a Morphix consultant at BP during 2015" is without basis in the record.[6] (<u>See</u> Mem. in Opp'n to Mot. for J. as a Matter of Law ("Morphix JMOL Mem.") at 5, ECF No. 157.) The fact that unrelated Morphix consultants continued working at BP into 2015 is irrelevant to whether <u>Zamora</u> would have continued. The jury may have agreed with Morphix's <u>ipse dixit</u>, but as previously noted, "the factfinder is not entitled to base a judgment on speculation or guesswork." <u>Zenith Radio Corp.</u>, 395 U.S. at 124.

Second, Morphix did not produce any evidence tending to show that BP would have accepted another Morphix consultant to continue Zamora's work had she assisted more in the transition. Once again, the fact that other Morphix

---

[6] The argument is also directly contradicted by Newman's testimony (in response to the Court's questioning during trial) that he understood and expected that Zamora was going to move out of a consulting role and into a full-time position with some other company at the end of 2014. (Trial Tr. at 82-83 ("The Court: So was it the case that she, therefore, was one away [sic] or the other going to be moving on, out of a consulting role and into some full-time employment with somebody? The Witness: That's what she said, yes. The Court: Okay. All right. And did you have any reason to view that as false or untrue? The Witness: No, I accepted that was how she felt and what she wanted to do.").)

18

consultants continued to work on different assignments into 2015 is irrelevant; each had different assignments, and BP had to independently authorize the work that each was doing. And the fact that BP intended to complete its changeover from consultants to BP employees by the end of 2016 (instead of, for instance, the end of 2014) does not support a reasonable inference that BP would have preferred or even accepted a separate Morphix consultant to continue Zamora's work in 2015. It is certainly possible to speculate that BP would have done so, but there is no evidence in the record to support such an inference.[7] And "[m]ere conjecture, surmise or speculation is not enough to sustain a claim for damages." Fiederlein, 56 N.Y.2d at 574.

Morphix certainly seems to have been surprised by Zamora's decision to discontinue her consulting work on the BPWA Project. But that alone does not entitle Morphix to damages. The record evidence clearly demonstrates that Zamora was free to discontinue her work with Morphix at any time, and that BP was free to bring Zamora's consulting work in-house at their discretion. It may be possible to envision a world in which Zamora (or some other Morphix contractor) continued consulting on the BPWA Project into 2015, but based on the evidence presented at

---

[7] Newman testified that when he went to meet with BP's program director for the World Adviser Project in late 2014, he "offered to ask for time to basically replace Mrs. Zamora on the project," but "it was [his] understanding clearly from that conversation, that Mr. Gibson had already made a decision to assign the work that previously was assigned to Morphix to an in-house resource." (Trial Tr. at 111-12.) But Newman did not (and indeed could not) testify as to why BP made that decision. There is no evidence in the record that BP decided to move Zamora's consulting work in-house because she was leaving Morphix, or that Zamora's job application caused Morphix to lose that consulting work. The Court addressed that deficiency in a special instruction to the jury: "So, ladies and gentlemen, you'll understand the witness is giving you his understanding. That is his state of mind. Whether it is right or wrong, you don't know whether or not BP had this view or didn't have this view. That is going to have to come in through something else." (Trial Tr. at 113.)

trial, no reasonable juror could have concluded that would have been the case absent defendants' conduct. In short, this is a textbook example of a case in which "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." Hernandez, 341 F.3d at 143-44. Defendants' Rule 50(b) motion must and shall be granted.

IV. CONCLUSION

For the reasons stated above, Zamora's motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) is GRANTED. Accordingly, the jury's verdict at ECF No. 144 is VACATED.

The Clerk of Court is directed to close all open motions.

The parties are directed to confer regarding the proper form of judgment and submit a proposal to the Court not later than **Monday, February 26, 2018**. Additionally, any application for fees shall be filed not later than **Wednesday, March 7, 2018**, with opposition due not later than **Wednesday, March 21, 2018** and reply due not later than **Wednesday, March 28, 2018**.

SO ORDERED.

Dated: New York, New York
February 21, 2018

_____
KATHERINE B. FORREST
United States District Judge